SHORT RECORD
25-2936
Filed 10/29/2025

**No. 25-XXXX**

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

————————————

*In re* KRISTI NOEM, *in her official capacity as Secretary, U.S. Department of Homeland Security*, et al.,

Petitioners.

————————————

On Petition for a Writ of Mandamus to the United States
District Court for the Northern District of Illinois

————————————

## PETITION FOR A WRIT OF MANDAMUS

————————————

BRETT A. SHUMATE
*Assistant Attorney General*

ERIC D. McARTHUR
*Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
DAVID L. PETERS
*Attorneys, Appellate Staff*
*Civil Division, Room 7517*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 598-6735*

**INTRODUCTION & SUMMARY**

Pursuant to the All Writs Act, 28 U.S.C. § 1651, and Federal Rule of Appellate Procedure 21, the federal government respectfully petitions this Court for a writ of mandamus directing the district court to vacate its October 28, 2025 order directing Gregory Bovino, a Chief Patrol Agent at U.S. Customs and Border Protection (CBP), to "appear in court, in person," every weekday "at 5:45 PM" "to report on the use of force activities for each day." *See* DE146, at 1.[1]  That obligation starts today, *i.e.*, within a few hours of this filing.  That extraordinary and extraordinarily burdensome order—entered without any formal finding that the government failed to comply with prior court orders—constitutes a clear abuse of discretion and violates the separation of powers.  Mandamus is the government's only available relief.

The case underlying this petition arises from protests in the Chicago area targeting immigration-enforcement operations by the Department of Homeland Security (DHS).  Although some protests have remained peaceful, others have turned violent, resulting in destruction of government property and injuries to scores of DHS officers and employees.  At the behest of plaintiffs—a collection of press organizations, journalists, and individual protesters who allege that DHS officers targeted them with crowd-control devices at certain protests—the district court entered a sweeping temporary restraining order (TRO) that applies throughout the

---

[1] Numbered docket entries in the district court case, No. 1:25-cv-12173, are abbreviated "DE#, at #."

Chicago area to severely limit officers' ability to use crowd-control devices to manage ongoing violent protests, including in contexts entirely detached from plaintiffs' claims. Although DHS strongly disputes the legal and factual basis for that order, the government has endeavored to comply with the TRO's requirements and agreed to continue the order until November 6 to allow the district court to consider plaintiffs' motion for a preliminary injunction, a hearing for which is set for November 5.

Since the entry of the TRO, however, the court has placed evolving and increasing burdens on the government in a purported effort to monitor compliance with the order. Although the government has endeavored to provide the court with the information it has requested, the court's demands have become untenable. In the course of a hearing on October 28, the district court again modified the TRO to further micromanage DHS officers' operations in the field, including how their uniforms must appear; imposed burdensome and ongoing disclosure obligations on the government; and questioned counsel about non-record material, including videos taken and sent in by the public. The hearing culminated in the October 28 order that Chief Bovino—a senior DHS officer who is overseeing various aspects of CBP's daily operations in the Chicago area—appear in person at 5:45 PM every weekday to "report" to the court and answer whatever questions the court might have. That unprecedented order interferes with Chief Bovino's ability to undertake his responsibilities, is unnecessary to secure compliance with the TRO, and is completely untethered to the claims and allegations underlying this lawsuit.

This Court has recognized that mandamus relief is appropriate to reverse court orders that "amount to a judicial usurpation of power or a clear abuse of discretion." *In re Petition of Boehringer Ingelheim Pharms., Inc., & Boehringer Ingelheim Int'l GmbH, in Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, 745 F.3d 216, 219 (7th Cir. 2014) (quoting *Cheney v. United States District Court for the District of Columbia,* 542 U.S. 367, 371 (2004)). Such relief is particularly warranted where, as here, an order raises serious separation-of-powers concerns by interfering with core Executive Branch operations. Indeed, this Court has granted mandamus relief for even lesser intrusions on Executive Branch prerogatives, such as compelling agency officials and staff to personally appear for questioning in open court on just one occasion and with regard to a discrete issue. *See Matter of Commodity Futures Trading Comm'n*, 941 F.3d 869, 872 (7th Cir. 2019).

The district court's extraordinary order more than meets the standard for mandamus relief. Requiring a senior executive official to appear for daily questioning far exceeds the recognized bounds of discovery. The order significantly interferes with the quintessentially executive function of ensuring the Nation's immigration laws are properly enforced by waylaying a senior executive official critical to that mission. And the order only underscores the extent to which the court has exceeded its judicial role by implementing vastly overbroad relief and arrogating to itself the role of supervising and micromanaging the day-to-day operations of Executive Branch law-

enforcement agencies. Accordingly, this Court should issue a writ of mandamus directing the district court to vacate its order.

## STATEMENT

### A.     Legal Background

Congress established the Department of Homeland Security to "keep[] America safe." DHS, *About DHS*, https://perma.cc/5Z2B-DER8; *see generally* 6 U.S.C. § 111. As relevant here, DHS's mission in Chicago encompasses two main objectives: the enforcement of federal immigration laws and the protection of federal personnel and property.

DHS is empowered to "control and guard the boundaries and borders of the United States against the illegal entry of aliens." 8 U.S.C. § 1103(a)(5). CBP is an agency within DHS charged with "enforc[ing] and administer[ing] all immigration laws." 6 U.S.C. § 211(c)(8). U.S. Immigration and Customs Enforcement (ICE), another agency within DHS, is likewise charged with enforcing and administering federal immigration laws, preventing terrorism, and combating transnational criminal threats. *See, e.g.*, 6 U.S.C. §§ 202, 252(a)(3). CBP and ICE officers have criminal and civil arrest authority. *See, e.g.*, 8 U.S.C. § 1357(a)(2), (4), (5); 19 U.S.C. § 1589a.

Congress has also charged the Secretary of Homeland Security with "protect[ing] the buildings, grounds, and property that are owned, occupied, or secured by the Federal Government . . . and the persons on the property." 40 U.S.C. § 1315(a). To fulfill this responsibility, the Secretary has designated DHS employees

4

for "duty in connection with the protection of property owned or occupied by the Federal Government and persons on the property, including duty in areas outside the property to the extent necessary to protect the property and persons on the property." *Id.* § 1315(b)(1).

### B.    Factual & Procedural Background

1.    Throughout the summer, DHS has seen a sharp increase in violent protests and attempts to impede its duties of enforcing the Nation's immigration laws. In Los Angeles, violent mobs attacked federal officers with concrete chunks and commercial-grade fireworks and used dumpsters as battering rams to breach federal buildings.  *See Newsom v. Trump*, 141 F.4th 1032, 1041 (9th Cir. 2025) (per curiam).  In Portland, agitators assaulted federal officers with rocks, bricks, and incendiary devices, followed federal officers to their homes, and threatened to kill them on social media. And in the Dallas area, a man opened fire on an ICE detention facility, killing two detainees and injuring another.

Similar events have unfolded in the Chicago area, particularly following the announcement of "Operation Midway Blitz"—a focused enforcement of the Nation's immigration laws in Illinois.  *See generally Illinois v. Trump*, 2025 WL 2937065, at *1 (7th Cir. Oct. 16, 2025).  Protests have occurred throughout the region, targeting immigration-enforcement activities and often becoming violent.  DHS officials testified that during routine immigration-enforcement operations in the field, government vehicles were "intentionally struck" by other vehicles, DE75, at 31:13-14

5

(Hearing Tr. (Oct. 20, 2025)); officers' means of ingress and egress were blocked to disrupt operations, *id.* 22:13-17; and violent agitators became "assaultive" in a manner that endangered officers' safety, *id.* 36:3-10; *see also* DHS, *Cicero or Sicario: A Day of Crashes* (Oct. 24, 2025), https://perma.cc/7EQK-TVTA (reporting incident in which a vehicle attempted to ram a DHS vehicle).  Moreover, dangerous criminal organizations, including the Latin Kings, have reportedly placed multi-thousand dollar "bounties" and "hits" on senior DHS officers operating in the area.  *See* DHS, *Latin Kings Gang Member Arrested in Illinois After Placing Hit on Commander at Large Border Patrol Chief Bovino* (Oct. 6, 2025), https://perma.cc/AW6E-5MYK.  That reportedly includes Chief Bovino, who oversees various aspects of CBP's operations in connection with Operation Midway Blitz.

DHS officers have conducted many of their operations without the use of force at all.  But some operations have necessitated the deployment of nonlethal crowd-control measures, consistent with existing DHS policies.

**2.**     The underlying lawsuit arises from protests at a DHS facility in Broadview, Illinois.  The Broadview facility is used for the intake and processing of individuals arrested by CBP and ICE, and it is the only such facility in the area. DE35-1, at ¶ 8 (Hott. Decl.).  The frequency and intensity of the protests escalated dramatically at the facility starting in early September 2025.  For example, violent protestors slashed employees' car tires, poured flour into a gas tank, and vandalized the facility and damaged its exterior plumbing system.  *Id.* ¶¶ 10, 12.  On several

occasions, violent protestors physically assaulted DHS employees, including non-officer employees. DE35-1, at ¶ 10. Violent protesters hit and punched officers; threw bottles and rocks at officers; and attacked moving vehicles attempting to enter the facility, including by slashing the vehicles' tires. *Id.* ¶¶ 10, 16. At least one officer was followed home from the facility and aggressively confronted there; his garage was later broken into and his government-owned vehicle damaged. *Id.* ¶ 23. And during the weekend of September 19-21, DHS found near the facility a round, green ball with a wick that was identified as an improvised explosive device. *Id.* ¶ 19. The Broadview incidents have left more than 30 DHS employees injured, including multiple injuries that required hospitalizations. *Id.* ¶ 22. During several protests, officers responded by issuing dispersal orders and by deploying crowd-control devices.[2]

**3.** Plaintiffs are individual protestors, journalists, and religious leaders as well as press organizations operating in the Chicago area. Plaintiffs allege that, during protests at the Broadview facility and at a handful of other incidents, DHS officers targeted them with nonlethal crowd-control devices in a manner that violated the First and Fourth Amendments as well as the Religious Freedom Restoration Act (RFRA).

---

[2] Since October 3, increased coordination with local law-enforcement officers has reduced the need for federal officers to engage with protestors at Broadview. *See Unified Command Established To Help Protect First Amendment Rights And Public Safety In Broadview* (Oct. 2, 2025), https://perma.cc/H3F3-GVYT. Even so, violence continues to occur at the Broadview facility. *See Trump*, 2025 WL 2937065, at *2.

*See* DE80, at ¶¶ 16-30 (Am. Compl.). The district court granted plaintiffs' request for preliminary relief and, on October 9, entered a sweeping TRO imposing all manner of intrusive and highly reticulated restrictions on DHS officers operating anywhere in the judicial district. *See* DE42, at 1-5.

DHS strongly disputes the legal and factual basis for the TRO. Nonetheless, the government has endeavored to comply with the TRO's requirements and consented to the order's extension to November 6 to allow the court to consider the plaintiffs' preliminary-injunction motion. *See* DE51. As DHS officials testified, the contents of the court's order were distributed to officers in the field with instructions that its terms must be strictly adhered to. *See* DE75, at 45:25-46:11.

4.    Over the next several weeks, under the guise of purporting to ensure compliance with the order, the district court repeatedly modified the TRO and imposed a series of increasingly demanding obligations on DHS. On October 16, the court called a hearing and *sua sponte* modified the order to impose additional requirements on DHS related to the use of body-worn cameras, based on what the court perceived to be inadequate compliance by agency personnel. *See* DE51; DE66 (modified order). On October 17, the court called another hearing and *sua sponte* directed DHS to make certain officials available to answer questions from the court related to ongoing compliance with the order. *See* DE65. At the hearing on October 20, the court spent several hours directly questioning DHS officials regarding agency policy and compliance with the order. *See* DE82. The court also granted plaintiffs

expedited discovery related to their preliminary-injunction motion, *see* DE82, requiring that Chief Bovino and two other senior CBP and ICE officials sit for two-hour depositions ahead of a hearing on plaintiffs' preliminary injunction motion set for November 5, *see* DE85.  On October 23, the court modified the discovery order to extend Chief Bovino's deposition to five hours and the other two depositions to three hours.  *See* DE87.  On October 24, the court ordered the government to produce Chief Bovino for in-person questioning at a hearing scheduled for October 28.  *See* DE91.

Many of these additional obligations have been imposed on the government *sua sponte* by the district court.  The obligations also appear to be prompted by the court's review of non-record materials, such as videos taken and "sen[t] in" by members of the public.  DE144, at 9:8-9 (Hearing Tr. (Oct. 28, 2025)).  At a hearing on October 16, for instance, the court raised compliance concerns premised on "getting images and seeing images on the news, [and] in the paper."  *See* DE52, at 3:18-23 (Hearing Tr. 3:18-23 (Oct. 16, 2025)) *see also id.* 3:15-17 ("I live in Chicago if folks haven't noticed. And I'm not blind, right?  So I don't live in a cave. I have a phone; I have a TV; I have a computer; and I tend to get news.").  Likewise, the court raised concerns about compliance at the October 28 hearing based on "the videos that I have seen taken by the public, taken by multiple members of the public" and "that citizens send in." DE144, at 9:8-9, 45:7-13.

At the October 28 hearing, Chief Bovino appeared in person to testify and answered questions from the court about the terms of the modified TRO and the agency's ongoing immigration-enforcement activities. The court also inquired about Chief Bovino's role in Operation Midway Blitz, including whether he had "an in" with DHS leadership. DE144, at 21:8-9 ("So you are in charge of this operation, right? And you I think probably have an in with Secretary Noem. Maybe?"). Following this appearance, the court yet again modified the terms of the TRO. The modified order directs all DHS officers "operating in Operation Midway Blitz to place an identifier conspicuously on their uniform where one can easily view it and the Agent's equipment does not obscure it." DE146, at 1. The court also imposed a set of disclosure requirements on DHS, including an ongoing obligation to provide the court with "CBP use of force reports and corresponding [body-worn camera] video within 24 hours of finalization of the CBP reports." *Id.* And as to Chief Bovino specifically, the court ordered him to wear a body-worn camera while in the field starting on Friday, October 31. *Id.*

As relevant here, the district court also required Chief Bovino "to appear in court, in person, week days at 5:45 PM … to report on the use of force activities for each day." DE146, at 1. The court imposed the requirement with no advance notice. The order also includes no limitation on the length of each hearing or what questions the court may pose to Chief Bovino. *See id.* The government requested that the requirements related to Chief Bovino's in-person appearances be stayed to facilitate

this Court's review of the extraordinary order. DE144, at 38:7-13, 47:5-13. The district court denied that request. DE146, at 1.

## ARGUMENT

The portion of the district court's October 28 order requiring Chief Bovino to appear in person for daily questioning by the court at 5:45 PM every weekday far exceeds the recognized bounds of discovery and fundamentally offends the separation of powers.[3] This Court should issue a writ of mandamus directing the district court to vacate that portion of the order.

A.    This Court is authorized to issue a writ of mandamus pursuant to the All Writs Act, 28 U.S.C. § 1651(a). Although "[m]andamus is a drastic remedy, reserved for urgent needs, …, for all that, it remains available to a litigant who can establish a clear right to relief and lacks any other way to protect his or her rights." *Matter of Commodity Futures Trading Comm'n*, 941 F.3d 869, 872 (7th Cir. 2019). For a writ to issue, the challenged order must be effectively unreviewable at the end of the case, such that the party will suffer irreparable harm; there must be a clear right to the writ; and the Court must be satisfied that issuing the writ is otherwise appropriate. *Abelesz v. OTP Bank*, 692 F.3d 638, 652 (7th Cir. 2012). As relevant here, this Court has held that "a party may petition the court of appeals for a writ of mandamus" when a

---

[3] Although the government strenuously objects to other aspects of the order, it limits this mandamus petition to the daily in-person testimony requirement for Chief Bovino.

11

court's order "'amount[s] to a judicial usurpation of power or a clear abuse of discretion,' or otherwise works a manifest injustice." *In re Petition of Boehringer Ingelheim Pharms., Inc., & Boehringer Ingelheim Int'l GmbH, in Pradaxa (Dabigatran Etexilate) Prods. Liab. Litig.*, 745 F.3d 216, 219 (7th Cir. 2014) (citation omitted) (alteration in original) (quoting *Cheney v. United States District Court for the District of Columbia,* 542 U.S. 367, 371 (2004)) (granting a writ of mandamus for a district court order based on the "risk of international complications arising from a U.S. judge's having ordered foreigners to be brought to the United States to be deposed"). Mandamus thus operates as a "'safety valve' enabling appellate review of such an order in the exceptional case." *Id.* (quoting *Mohawk Industries, Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)).

Mandamus relief is particularly appropriate where a court order implicates separation-of-powers concerns. In *Matter of Commodity Futures Trading Comm'n,* for example, this Court granted mandamus relief from an order directing the Chairman and two Commissioners of a federal agency as well as senior members of their staff, "to appear for questioning in open court." *See* 941 F.3d at 872. This Court explained that the order to appear could not "be reviewed on appeal from a final decision." *Id.* The Court further stressed that the order raised the possibility of an inappropriate "inquest into the internal deliberations of the Executive Branch's senior officials." *Id.* The Court reasoned that the principle warranted granting relief not only to the Chairman and Commissioners, but also to the agency's staff "because members of federal agencies are entitled to the assistance of their staffs." *Id.* at 873. Other courts

have likewise granted mandamus relief where orders implicated separation-of-powers concerns. *See, e.g., Karnoski v. Trump*, 926 F.3d 1180 (9th Cir. 2019) (per curiam).

**B.**     The requirements for the issuance of a writ of mandamus are more than satisfied here. As explained, Chief Bovino is a critical part of the government's efforts to enforce the Nation's immigration laws, which the Executive Branch is undertaking pursuant to its constitutional and statutory obligations to faithfully execute federal law. Chief Bovino oversees various aspects of CBP's operations in the Chicago area. As his testimony at the October 28 hearing established, DE144, at 35:10-14, Chief Bovino is often in the field directly supervising law-enforcement personnel conducting immigration-enforcement activity. He is thus responsible for, among other things, ensuring the success of DHS operations and the safety of its personnel.

Requiring Chief Bovino to appear in court and submit to extensive questioning every weekday would impermissibly interfere with those missions. The requirement to appear daily before the district court would be incredibly demanding of Chief Bovino's time. Chief Bovino would not only need to attend hearings that are not subject to any time limitations. He would also need to prepare and be ready to answer open-ended questions about DHS's "use of force activities for each day." DE146, at 1. Given that the agency is conducting numerous and diverse activities throughout the Chicago area, merely collecting the relevant information and being prepared to testify to it would be incredibly demanding if not impossible given that daily reports may not be fully compiled by the time of the daily hearing. "The time taken away

13

from [Chief Bovino's] official duties will be lost forever." *Matter of Commodity Futures Trading Comm'n*, 941 F.3d at 872. It would also deprive the Executive Branch of the leadership of a key senior official at a critical time in the Chicago area, when DHS officers are under serious threat of attack and bounties have reportedly been placed upon them. *See supra*. p. 5-6. Whatever the breadth of a district court's discretion to manage proceedings and to ensure compliance with its orders, that discretion does not extend so far as to justify requiring a senior Executive Branch official to appear in court for open-ended questioning about ongoing DHS operations at 5:45 PM every weekday.

That is particularly so, given that the government has already made substantial efforts to satisfy the evolving and increasingly intrusive burdens placed on the government in the name of monitoring compliance with the TRO. As explained, the court has in the last few weeks modified the TRO to impose additional requirements on DHS related to the use of body-worn cameras, DE51; DE66; directed DHS to make other senior officials available to answer questions from the court related to ongoing compliance with the order, s*ee* DE65; DE82; required Chief Bovino and two other senior officials to sit for multi-hour depositions ahead of a hearing set for November 5, *see* DE85; and, most recently, imposed substantial and ongoing disclosure requirements related to use-of-force reports and body-worn camera footage, *see* DE146, at 1. Many of these obligations have been imposed *sua sponte* by the court and have been based, at least in part, on the court's review of non-record

materials.  The government nonetheless has undertaken substantial effort to comply with the requirements, including making Chief Bovino available for the October 28 hearing.  There is no need to *also* require that Chief Bovino attend daily hearings to "report" to the court, EE146, at 1, especially where any relevant information can be disclosed through other, alternative means.

Nor is the daily appearance of Chief Bovino in open court an appropriate response to what plaintiffs assert are alleged violations of the court's TRO.  District courts have a variety of mechanisms available to ensure compliance with their orders.  That includes, ultimately, the threat of contempt proceedings.  Although plaintiffs have filed "notices" of alleged violations of the TRO, *see* DE90, DE94, DE118, DE140, they have expressly declined to seek contempt or other sanctions, DE142, at 3, and the district court has made no formal findings that the TRO has been violated.  The district court has nevertheless ordered Chief Bovino to appear daily to, in effect, guarantee to the court's satisfaction the government's ongoing compliance with the TRO.  Nothing justifies that extraordinary requirement.

The court's order, moreover, is unmoored from the underlying claims in this litigation.  The order appears to have been prompted by a handful of alleged incidents during which, plaintiffs say, DHS officers deployed crowd-control devices in a manner that violated the district court's order.  DE142, at 1-2 (citing DE90, DE94, DE118, DE140).  The court also raised concerns about the potential deployment of crowd-control devices in or around Halloween.  DE144, at 8:13-16, 30:1.  Tellingly,

none of these incidents of alleged noncompliance involves the Broadview facility or any of the named plaintiffs. *See* DE90-1, at 1 (declaration of non-party Byron Sigcho-Lopez); DE94-1, at 1 (declaration of non-party Yohanna Sotelo); DE94-2, at 1 (declaration of non-party John Bodett); DE94-3, at 1(declaration of non-party Enrique Bahena); DE118-1, at 1 (declaration of non-party James Hotchkiss); DE118-2, at 1 (declaration of non-party Brian Kolp); DE140-1, at 1 (declaration of non-party Dallas Knapp); DE140-2, at 1 (declaration of non-party Tara Goodarzi).[4]  The court's order thus requires Bovino to appear for daily questioning about ongoing agency operations that have no discernable connection to the named plaintiffs or to their underlying claims.  The Supreme Court, however, has made clear that such sweeping relief "extend[ing] beyond the parties" to the suit contravenes the party-specific principles underlying courts exercise of their equitable authority.  *Trump v. CASA, Inc.*, 606 U.S. 831, 844 (2025).

For much the same reason that it constitutes a clear abuse of discretion of the court's authority to manage proceedings and ensure compliance to require Chief Bovino to appear for daily questioning, it also offends the separation of powers.  The order places an enormous and undue burden on a senior executive official tasked with carrying out quintessential executive priorities.  This Court, moreover, has recognized

---

[4] Plaintiffs' class allegations cannot justify the scope of the district court's remedial measures because "the district court has not certified [the] class and may never do so."  *Campbell v. Miller*, 373 F.3d 834, 836 (7th Cir. 2004).

that orders requiring executive officials or their staff "to appear for questioning in open court" are problematic precisely because of the potential for questioning to devolve into an improper "inquest into the internal deliberations of the Executive Branch's senior officials." *Matter of Commodity Futures Trading Comm'n*, 941 F.3d at 872. That is true even where orders involve senior staff members short of ranking officials—like Chief Bovino—because ranking "members of federal agencies are entitled to the assistance of their staff." *Id.* at 873. It is the role of the Executive Branch, under the direction of the President, not the federal courts, to oversee the day-to-day execution of the laws. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021) (federal courts "do not possess a roving commission" to "exercise general legal oversight of the . . . Executive Branch[]").

The micromanaging of Chief Bovino's daily operations is particularly concerning in light of reports that dangerous criminal organizations have placed multi-thousand dollar "bounties" and "hits" on him specifically. *See* DHS, *Latin Kings Gang Member Arrested in Illinois After Placing Hit on Commander at Large Border Patrol Chief Bovino* (Oct. 6, 2025), https://perma.cc/AW6E-5MYK. Requiring Chief Bovino to appear at the same place at the same time every weekday exacerbates the potential dangers he faces. In short, there are good reasons why courts should not place themselves in the untenable position of managing day-to-day federal-law enforcement operations, which is quintessentially a prerogative of the Executive. *See Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 453 (1990) (explaining that the "decision as to which

17

among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger" should not be "transfer[red] from politically accountable officials to the courts").

## CONCLUSION

This Court should issue a writ of mandamus vacating the district court's October 28 order requiring Chief Bovino to appear for daily questioning.

Respectfully submitted,

BRETT A. SHUMATE
  *Assistant Attorney General*

ERIC D. MᶜARTHUR
  *Deputy Assistant Attorney General*

MARK R. FREEMAN
COURTNEY L. DIXON
  */s/ David L. Peters*
DAVID L. PETERS
  *Attorneys, Appellate Staff*
  *Civil Division*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 598-6735*
  *David.l.peters@usdoj.gov*

OCTOBER 2025

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I hereby certify that this petition complies with the requirements of Fed. R. App. P. 21(d) and 32(c)(2) because it has been prepared in 14-point Garamond, a proportionally spaced font, and that it complies with the type-volume limitation of Fed. R. App. P. 21(d)(1) because it contains 4,386 words, according to Microsoft Word.

*/s/ David L. Peters*
David L. Peters

## CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2025, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system. Service has been accomplished via email to the following counsel:

*Counsel for Plaintiffs-Respondents:*

wally.hilke@law.northwestern.edu
kfee@aclu-il.org
rglenberg@aclu-il.org
hannah@first-defense.org
daniel@first-defense.org
futterman@uchicago.edu
jon@loevy.com
locke@lovely.com

The district court will be provided with a copy of this petition for writ of mandamus pursuant to Federal Rule of Appellate Procedure 21(a).

*/s/ David L. Peters*
David L. Peters